1  CHRISTOPHER J. CANNON, State Bar No. 88034
MATTHEW A. LAWS, State Bar No. 273697
2  Sugarman & Cannon
737 Tehama Street, No. 3
3  San Francisco, CA 94103
Telephone: 415-362-6252
4  Facsimile: 415-362-6431
chris@sugarmanandcannon.com
5
Attorneys for Defendant  NAMRATA PATNAIK
6
7                    UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9                         SAN JOSE DIVISION

10  UNITED STATES OF AMERICA,              Case No. 22-CR-00014 BLF

11          Plaintiff,                     **DEFENDANT NAMRATA PATNAIK'S
                                           MOTION TO DISMISS THE INDICTMENT**
12          vs.                            **FOR FAILURE TO STATE AN OFFENSE**

13  NAMRATA PATNAIK,

14          Defendant.

15                          <u>**NOTICE AND MOTION**</u>

16
17  **TO:    UNITED STATES OF AMERICA, PLAINTIFF; AND STEPHANIE M. HINDS,
           UNITED STATES ATTORNEY**

18          **PLEASE TAKE NOTICE** that on a date to be set by the Court, defendant NAMRATA

19  PATNAIK, through counsel, Christopher J. Cannon, will and does hereby move to dismiss the

20  Indictment.  The defense will meet and confer with the government on a briefing schedule to be

21  submitted for the Court's approval.  This motion is based on the Fifth, and Sixth Amendments to the

22  United States Constitution, Federal Rules of Criminal Procedure 7 and 12, the entire record in this action,

23  this motion, the below memorandum of points and authorities, and such argument and evidence as

24  counsel may present prior to a decision in this matter.

25

26

27

28

1

## TABLE OF CONTENTS

2

TABLE OF AUTHORITIES ..................................................................................................... iii

3 I.      INTRODUCTION ....................................................................................................1

4 II.    BACKGROUND .......................................................................................................2

5      A.     The Indictment .............................................................................................2

6             1.     Count One - Conspiracy.................................................................2

7             2.     Counts Two, Three, and Four – Visa Fraud..................................3

8             3.     Count Five .....................................................................................3

9             4.     Incorporated Paragraphs ...............................................................4

10     B.     The H-1B Program.......................................................................................5

11             1.     History and Overview of the H-1B Visa Program.................................5

12             2.     DOL's Labor Conditions Application and Area of Intended Employment............5

13             3.     How Congress and the Courts Have Resolved the Differing Views between DOL and USCIS regarding H-1B Visas .................................................7

14

            4.     Anachronisms in the New Petition for H-1Bs: Form I-129 .................................11

15

III.   LEGAL STANDARD.............................................................................................11

16

IV.   ARGUMENT ..........................................................................................................14

17 V.    CONCLUSION.......................................................................................................19

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Forbes v. INS,
   48 F.3d 439 (9th Cir. 1995) ........................................................................12

Hussein v. Barrett,
   No. 11-cv-05317-JST, 2017 U.S. Dist. LEXIS 44790 (N.D. Cal. Mar. 27, 2017) ..............................13

ITServe Alliance, Inc. v. Cissna,
   443 F.Supp.3d 14 (D.D.C. 2020) ......................................................*passim*

Kungys v. United States,
   485 U.S. 759 (1988) ....................................................................12

Maslenjak v. United States,
   137 S. Ct. 1918 (2017) ..............................................................11, 12

Matter of S-Inc.,
   Adopted Decision 2018-02 ...............................................................9

Serenity Info Tech, Inc. v. Cuccinelli,
   461 F.Supp.3d 1271 (N.D. Ga. 2020) ..........................................9, 14, 18

Matter of Simeio Solutions, LLC,
   26 I&N Dec. 542 (AAO 2015) ..............................................................6

Stellar IT Sols., Inc. v. U.S. Cit. & Imm. Servs.,
   Civil Action No. 18-2015 (RC), 2020 U.S. Dist. LEXIS 10355 (D.D.C. June 12, 2020) ..........9, 14, 18

United States v. Alferahin,
   433 F.3d 1148 (9th Cir. 2006) .........................................................11

United States v. Boren,
   278 F.3d 911 (9th Cir. 2002) ..........................................................11

United States v. Chu,
   5 F.3d 1244 (9th Cir. 1993) ........................................................11, 15

United States v. Guntipally,
   No. 16-CR-00189-JSC-1, 2022 U.S. Dist. LEXIS 92261, 2022 WL 2183285 (N.D. Cal. May 23, 2022) ..............................................................16, 17

United States v. Maslenjak,
   821 F.3d 675 (6th Cir. 2016) ..........................................................12

United States v. Matsumaru,
   244 F.3d 1092 (9th Cir. 2001) .....................................................11, 14, 15

United States v. Narang,
    No. 19-4850, 2021 U.S. App. LEXIS 23566, 2021 WL 3484683 (4th Cir. Aug. 9, 2021) ............16, 17

United States v. Shortt Accountancy Corp.,
    785 F.2d 1448 (9th Cir.), cert. denied, 478 U.S. 1007 (1986) .............................13

United States v. Wang,
    944 F.3d 1081 (9th Cir. 2019) ..................................................................................11, 15

**Statutes**

8 U.S.C. § 1101 ...........................................................................................................4, 5, 14

8 U.S.C. § 1182 ................................................................................................................5

8 U.S.C. § 1182 ........................................................................................................8, 15, 16

8 U.S.C. § 1184 ..........................................................................................................5, 8, 14

18 U.S.C. §§ 1546(a) and 2 ...........................................................................................3

28 U.S.C. § 1746 .............................................................................................................3

18 USC § 2 ......................................................................................................................2

18 USC § 371 ..................................................................................................................2

18 USC § 1425 ..............................................................................................................12

18 USC § 1546 ......................................................................................................2, 11, 15

18 USC § 1957 .............................................................................................................2, 3

1990 Immigration and Naturalization Act .....................................................................16

American Competitiveness and Workforce Improvement Act of 1998 ......................7, 8

Immigration and Nationality Act ..............................................................................4, 5, 6

Pub. L. 101–649, 104 Stat 4978, November 29, 1990..................................................4

Title IV, Pub. L. 105-277 (October 21, 1998) ..............................................................7

**Other Authorities**

8 C.F.R. § 214.2(h) ...................................................................................................6, 7, 9

20 C.F.R. § 655.715 ........................................................................................................5

20 C.F.R. § 655.730 ........................................................................................................5

20 C.F.R. §§ 655.731-655.735 .................................................................... 5-7, 8, 15

20 C.F.R. § 655.800 ................................................................................................ 16

22 C.F.R. § 41.51(p) .............................................................................................. 14

136 Cong Rec .......................................................................................................... 4

56 Fed. Reg. 54720, 54720-21 (October 27, 1991) ............................................... 5

56 Fed. Reg. 54720, 54721 (October 27, 1991) .................................................... 16

56 Fed. Reg. 54720-54739 (October 22, 1991) ...................................................... 7

56 Fed. Reg. 61111, 61121 (December 2, 1991) .................................................... 7

57 Fed. Reg. 1316-1338 (January 13, 1992) .......................................................... 7

59 Fed Reg. 65646 (December 20, 1994) ............................................................... 7

63 Fed. Reg. 30419, 30421 (June 4, 1998) ............................................................ 7

**Policy Memoranda**

Policy Memorandum AD 10-24, "Determining Employer-Employee Relationship for Adjudication of H-1B Petitions, Including Third-Party Site Placements"…………………………………………8

Policy Memorandum PM-602-0157, "Contracts and Itineraries Requirements for H-1B Petitions Involving Third-Party Worksites" available at https://www.uscis.gov/sites/default/files/document/memos/2018-02-22-PM-602-0157-Contracts-and-Itineraries-Requirements-for-H-1B.pdf (accessed July 12, 2022) .......................................... 1, 7, 9, 15

Policy Memorandum PM-602-0114, "Rescission of Policy Memoranda" (June 17, 2020) available at https://www.uscis.gov/sites/default/files/document/memos/PM-602-0114_ITServeMemo.pdf (accessed July 12, 2022)……………………………………………………… 1, 2, 10, 11, 13-18

Policy Memorandum PM-602-0120, "USCIS Final Guidance on When to File an Amended or New H-1B Petition After Matter of Simeio Solutions, LLC" available at https://www.uscis.gov/sites/default/files/document/memos/2015-0721_Simeio_Solutions_Transition_Guidance_Memo_Format_7_21_15.pdf (accessed July 12, 2022). ....................................................................................................... 6

**Forms**

https://www.uscis.gov/sites/default /files/document/forms/i-129instr.pdf (accessed July 12, 2022) 10

https://www.uscis.gov/sites/default/files/document/forms/i-129.pdf (accessed June 20, 2022) ..10

**MEMORANDUM**

## I.    INTRODUCTION

The Indictment against Namrata Patnaik and Kartiki Parekh fails to state an offense.  The government alleges the defendants engaged in visa fraud in connection with PerfectVIPs, Inc.'s submission of H-1B visa applications.  Specifically, the government alleges the company falsely stated in I-129 petitions and in responses to Requests for Evidence ("RFE") submitted to the United States Citizen and Immigration Services ("USCIS") that the H-1B applicants would be working onsite at the company's office and on internal projects, when defendants knew that was not the case.  Assuming those allegations to be true for the purposes of this motion, the incorrect statements were not a crime.  It is not a crime to provide USCIS with incorrect information about where an H-1B beneficiary will be conducting his or her work, or what particular project a beneficiary will be working on.  USCIS is only authorized to inquire whether a beneficiary will be working in a "specialty occupation" in a particular Metropolitan Statistical Area ("MSA").  The granular detail demanded by USCIS is not legally material to USCIS's determination of H-1B eligibility.

The reason the answers could not be material is because the questions that the government claims were answered incorrectly were not authorized by statute or regulation and were used by USCIS to illegally lengthen and complicate the visa application process with the intent of reducing visas to IT staffing companies.

USCIS has a history of hostility to the staffing service business model and placed various obstacles in the path of companies like PerfectVIPs, that place employees at third party job sites.  Those obstacles were set out in two Policy Memoranda, the formal names of which speak for themselves: "Determining Employer-Employee Relationship for Adjudication of H-1B Petitions, Including Third-Party Site Placements," HQ70/6.2.8 (10-24), issued January 8, 2010; and "Contracts and Itineraries Requirements for H-1B Petitions Involving Third-Party Worksites," PM-602-0157, issued February 22, 2018.  Relying on these now-withdrawn policy memoranda, USCIS required companies petitioning for H-1Bs to answer questions about precisely where beneficiaries would be working and what projects they would have for the entire three year visa period.  Those obstacles were ruled to be arbitrary and capricious and in excess of USCIS's statutory authority in ITServe Alliance, Inc. v. Cissna, 443

F.Supp.3d 14 (D.D.C. 2020).  Following its defeat in the courts, USCIS issued a new policy memorandum, PM-602-0114, rescinding the earlier policy memoranda and abandoning its attempts to discriminate against third party work sites.

Unfortunately, the bureaucratic procedures have not caught up with the law.  The I-129 form still requests information that is not material to USCIS's decision.  Just because the questions remain on the I-129 form, however, does not make the answers material.  The law determines what is and is not material, and, simply put, false answers about whether an employee will work onsite or offsite and on what specific project are not material to USCIS's decision.  As a result, the Indictment must be dismissed for failure to state a crime.

## II.    BACKGROUND

### A.  The Indictment

Count One of the Indictment charges the defendants with conspiracy to commit visa fraud under 18 USC § 371.  In Counts Two through Four, the Indictment charges the defendants with substantive counts of visa fraud under 18 USC § 1546(a), in conjunction with 18 USC § 2, aiding and abetting.  Count Five charges Patnaik with money laundering under 18 USC § 1957.  The details are set out below, but the thrust of the charge is that PerfectVIPs submitted documentation in support of the H-1B applications and in response to Requests for Evidence that said the foreign workers would be working at PerfectVIPs on internal projects and alleges the defendants knew the foreign workers would be working offsite for other clients of PerfectVIPs.

Because this is a motion to dismiss, for the purposes of this motion only, the defense will treat the allegations of the Indictment as accurate.  We would like to emphasize, however, that the statutes and regulations governing H-1B visas focus on the issue of qualification for a position in a "specialty occupation," rather than on a particular assignment, and a new Labor Condition Application ("LCA") is not required if the new assignment location is in the same MSA as the original assignment location, and the defendants often alerted the government to the change in assignment location by filing new LCAs, even when new LCAs were not required.

#### 1.  Count One - Conspiracy

Under the § 371 conspiracy charged in Count One, pages 3 through 7 of the Indictment detail

alleged overt acts that follow three basic forms.  Overt acts "a" through "n" and act "x" are formulated as

follows:

> On or about [DATE], PATNAIK and PAREKH caused the PerfectVIPs submission
> of an I-129 Petition for beneficiary [BENEFICIARY INITIALS], bearing PAREKH's
> signature, falsely stating that the beneficiary would work at PerfectVIPs

Overt acts "o" through "r" and act "w" are formulated as follows:

> On or about [DATE], PATNAIK and PAREKH caused the PerfectVIPs submission
> of a Response to a Request for Evidence for beneficiary [BENEFICIARY
> INITIALS], falsely stating that PerfectVIPs entered into a contract with a third party
> to provide the engineering services of the beneficiary

Overt acts "s" and "u" take the following format:

> On or about [DATE], PATNAIK emailed PAREKH regarding a Request for
> Evidence for beneficiary [BENEFICIARY INITIALS], and attached a statement of
> work for [BENEFICIARY INITIALS], falsely stating that [BENEFICIARY
> INITIALS], would work for PerfectVIPs on projects for a third party

And overt acts "t" and "v" take the following format:

> On or about [DATE], PATNAIK and PAREKH caused the PerfectVIPs submission
> of a Response to a Request for Evidence for beneficiary [BENEFICIARY
> INITIALS], falsely stating that PerfectVIPs entered into a contract with a third party
> to provide the engineering services of the beneficiary

## 2.   Counts Two, Three, and Four – Visa Fraud

Counts Two through Four charge substantive violations of 18 U.S.C. §§ 1546(a) and 2, visa fraud

and aiding and abetting, alleging that Patnaik and Parekh:

> aiding and abetting and aided and abetted by each other, knowingly made under oath,
> and subscribed as true under penalty of perjury under 28 U.S.C. § 1746, false
> statements with respect to material facts in an application, an affidavit, and a
> document required by the immigration laws and regulations prescribed thereunder,
> namely, in the I-129 Petitions and supporting documentation for H-1B nonimmigrant
> worker applicants, by falsely representing that the below-listed applicants would be
> employed by PerfectVIPs to work on Perfect VIPs in-house projects and contracts at
> Perfect VIPs' office locations, when the defendants knew at the time that these
> representations were false

The Indictment then provides three dates and beneficiary initials to illustrate the alleged violations in

Counts Two, Three, and Four. Doc. No. 1, Indictment at 7.

## 3.   Count Five

Count Five charges Ms. Patnaik with money laundering in violation of 18 U.S.C. § 1957 in

connection with a monetary transaction allegedly involving funds derived from the visa fraud activities

1    outlined in Counts One through Four. Id. at 8.

2        **4.  Incorporated Paragraphs**

3        Each Count incorporates by reference all the preceding paragraphs in the Indictment.  Paragraphs

4    4 through 8 provide a description of the H-1B program and application process.  Relevant to this motion,

5    Paragraph 6 states that the employer must submit to the Department of Labor ("DOL") a completed LCA

6    that "requires the employer, acting as a petitioner, to provide information including statements about the

7    existence, duration, and wages associated with the temporary job need, and to make several attestations,

8    including regarding labor conditions."  Doc. No. 1, Indictment at 2.

9        Paragraph 7 states that after the LCA is approved, the petitioner submits a Form I-129 Petition

10   with USCIS which, among other things, "requires the name and biographical data of the proposed foreign

11   worker, the proposed wage to be paid, and the address where the foreign worker will be working as well

12   as biographical information about the petitioner." Id.

13       Paragraph 8 adopts the withdrawn discrimination against foreign workers working at third party

14   job sites language and alleges: "When a petitioner other than the ultimate employer applies for an H-1B

15   visa for a foreign worker, the ultimate employer seeking to hire the worker is referred to as the "end-

16   client."" Id.

17       Paragraphs 9 through 11 then describe the alleged fraud.  Paragraph 9 states that the H-1B

18   applications "required the petitioner to represent to the United States, under penalty of perjury and

19   criminal and civil penalties, the true name, location, terms, and duration of the underlying employment

20   position to be filled by the stated beneficiary in each H-1B application. Id. at 2-3

21       Paragraph 10 states the defendants submitted fraudulent documents "in order to create a pool of

22   H-1B beneficiaries who could thereafter be placed at employment positions with employers other than

23   PerfectVIPs (in conflict with the representations in the visa applications)." Id. at 3.

24       Paragraph 11 states the defendants submitted LCA forms, I-129 petitions, and supporting

25   documentation that falsely stated the foreign workers would be working onsite at PerfectVIPs' offices on

26   internal projects, when the defendants "contracted the workers out to end clients possessing actual work."

27   Id.

28

**B. The H-1B Program**

**1. History and Overview of the H-1B Visa Program**

In 1990, Congress amended the Immigration and Nationality Act ("INA") and created a new nonimmigrant visa category - H-1B - for professionals in "specialty occupations." Pub. L. 101–649, 104 Stat 4978, November 29, 1990, codified at 8 U.S.C. § 1101(a)(15)(H)(i)(b). This category was part of a broader reform to increase the number of high-skilled and professional employees that the United States needed in order to stay competitive in the global marketplace. See 136 Cong. Rec. S 17103, 17103 (1990) (discussing the need for more high-tech employees in the US economy).

Congress split jurisdiction over this new visa category between the Department of Labor ("DOL") and the Immigration and Nationality Service ("INS"). Congress gave DOL the authority to regulate who is an H-1B employer, to define the area of intended employment, and to set and enforce H-1B prevailing wages. 8 U.S.C. § 1182, subp. (n) and (p). Congress gave INS, which is now known as USCIS, the more limited role of deciding whether the visa petition was for a "specialty occupation." 8 U.S.C. § 1184(i). This specialty occupation inquiry is limited to assessing three pieces of information:

1. Whether the occupation require a highly specialized body of knowledge;
2. Whether the occupation require a degree in a specific specialty; and
3. Whether the prospective employee ("beneficiary") possesses the requisite knowledge and degree.

Id. Nowhere in the INA did Congress grant USCIS the ability to regulate the location of employment or require a particular assignment to qualify as a "specialty occupation." See 8 U.S.C. § 1101, et seq.

**2. DOL's Labor Conditions Application and Area of Intended Employment**

The H-1B process begins when an employer in the United States files a Labor Conditions Application ("LCA") on DOL's ETA Form 9035. 20 C.F.R. § 655.730. All employers attest that they will comply with five key program requirements:

1. They will at all times pay at least the prevailing wage for the geographic area of intended employment;
2. Working conditions will not adversely impact US workers;
3. The employee would not be used to backfill striking union workers;
4. The employer will comply with DOL's regulation governing posting of LCAs. Id. at (d), and §§655.731-734; and
5. The employer must agree to participate in post approval enforcement proceedings.

Interim Final Rule, 56 Fed. Reg. 54720, 54720-21 (October 27, 1991); see also 20 C.F.R. §§ 655.731-

655.735.

What is noticeably absent from this list is a requirement that DOL know the specific address at which the employee will be working or a description of the assignment on which they will work for each day of the visa validity period. Rather, what DOL is concerned with is the "area of intended employment" which is defined at 20 C.F.R. § 655.715 as:

> the area within normal commuting distance of the place (address) of employment where the H-1B nonimmigrant is or will be employed. There is no rigid measure of distance which constitutes a normal commuting distance or normal commuting area, because there may be widely varying factual circumstances among different areas (e.g., normal commuting distances might be 20, 30, or 50 miles). *If the place of employment is within a Metropolitan Statistical Area (MSA) or a Primary Metropolitan Statistical Area (PMSA), any place within the MSA or PMSA is deemed to be within normal commuting distance of the place of employment;* however, all locations within a Consolidated Metropolitan Statistical Area (CMSA) will not automatically be deemed to be within normal commuting distance. The borders of MSAs and PMSAs are not controlling with regard to the identification of the normal commuting area; a location outside of an MSA or PMSA (or a CMSA) may be within normal commuting distance of a location that is inside (e.g., near the border of) the MSA or PMSA (or CMSA).

(Emphasis added.)

Through regulation, USCIS requires an approved petition be amended with a new filing when there is a "material change" to the position. 8 C.F.R. §§ 214.2(h)(2)(i)(E) and (11)(i)(A). Although "material change" is not defined in the regulation; id.; USCIS has issued a binding decision which holds an amended petition is *not required*, and no notice need be given to USCIS, when an employee is reassigned to a new intra-MSA work site. Matter of Simeio Solutions, LLC, 26 I&N Dec. 542 (AAO 2015); PM-602-0120*: "USCIS Final Guidance on When to File an Amended or New H-1B Petition After Matter of Simeio Solutions, LLC."* After the decision in Simeo Solutions, USCIS issued Policy Memo PM-602-0120, which clearly states: "If a petitioner's H-1B employee is simply moving to a new job location within the same area of intended employment, a new LCA is not generally required." PM-602-0120, available at https://www.uscis.gov/sites/default/files/document/memos/2015-0721_Simeio_Solutions_Transition_Guidance_Memo_Format_7_21_15.pdf (accessed July 12, 2022), citing INA § 212(n)(4); 20 CFR 655.734.

Accordingly, the entire statutory and regulatory framework demonstrates USCIS is supposed to focus on whether the visa petition was for a "specialty occupation," and whether the beneficiary qualifies

1    to perform a specialty occupation, rather than focus upon the particular assignment or location where

2    beneficiaries may work in a specialty occupation; and petitioners are allowed to change the project

3    locations and assignments, even before a petition is granted.

4

5    **3.  How Congress and the Courts Have Resolved the Differing Views between DOL and USCIS regarding H-1B Visas**

6        Notwithstanding the clear division of responsibilities between DOL and USCIS - with DOL

7    focused on ensuring that employers have committed to paying the prevailing wage in the geographic area

8    in which the employee will work, among other issues, and USCIS responsible for ensuring the

9    employee's occupation qualifies as a specialty occupation - from the earliest  days of the H-1B program,

10   DOL and INS/USCIS have disagreed about whether information technology ("IT") staffing companies

11   are statutory H-1B employers and thus eligible for H-1B visas.

12       As noted earlier, USCIS's attempts to discriminate against applications from employers who may

13   place employees at third party sites, or what the Indictment refers to as "end clients," is demonstrated by

14   the titles of the two rescinded policy memoranda attempting to distinguish between workers at the home

15   office and at third party sites: "Determining Employer-Employee Relationship for Adjudication of H-1B

16   Petitions, Including *Third-Party Site Placements*," HQ70/6.2.8 (10-24), issued January 8, 2010 (emphasis

17   added); and PM-602-0157 "Contracts and Itineraries Requirements for H-1B Petitions Involving *Third-*

18   *Party Worksites*," issued February 22, 2018 (emphasis added).

19       Through several rounds of rulemaking, DOL considered and rejected proposals that sought to

20   create different eligibility requirements for IT staffing companies using the H-1B visa. See 56 Fed. Reg.

21   54720-54739 (October 22, 1991); 57 Fed. Reg. 1316-1338 (January 13, 1992); 59 Fed Reg. 65646

22   (December 20, 1994) (DOL stated that it "considered carefully the comments concerning the job

23   contractor concept as proposed and has decided - at this time - *not to establish special procedures*

24   *applicable only to those businesses operating as job contractors*.") (emphasis added).  The controlling

25   regulation, however, states that to qualify as an eligible H-1B employer, companies need only show that

26   they: "may hire, pay, fire, supervise, *or otherwise control the work*…" 56 Fed. Reg. 61111, 61121

27   (December 2, 1991) (emphasis added).  INS adopted DOL's definition of employer without change.

28   8 C.F.R. § 214.2(h)(4)(ii).

1    Despite both INS's and DOL's definition of an H-1B "employer" explicitly including job

2  contractors, INS sought ways to eliminate IT staffing companies from the H-1B program.  Notably, in

3  1997 and 1998, the two agencies had competing approaches to address "benching," which is the failure

4  to pay wages when there is no work for an H-1B employee to perform.  DOL crafted a regulation that

5  filled the statutory gap and required employers to pay the prevailing wage even when there was no work

6  to perform. 20 C.F.R. § 655.731(c)(5)(i) (1997) (requiring employers to pay H-1B wages for employees

7  in a nonproductive status).  Meanwhile, INS proposed a rule that would prohibit DOL's concept of

8  "nonproductive status" and require employers to prove there were nonspeculative work assignments for

9  the duration of the H-1B visa. 63 Fed. Reg. 30419, 30421 (June 4, 1998), Proposed Rule (June 4, 1998).

10    Congress took notice of these dueling views of the H-1B program and in response passed the

11  American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA"), which adopted

12  DOL's approach to benching and established DOL's regulation as the preferred policy choice within the

13  new statute.  Title IV, Pub. L. 105-277 (October 21, 1998).  ACWIA substantially added to DOL's LCA

14  enforcement and oversight powers in 8 U.S.C. § 1182(n) and empowered DOL to ensure U.S. employers

15  were not displacing U.S. workers with H-1B employees. 8 U.S.C. § 1182(n)(2)(E)-(G).  Congress also

16  adopted DOL's nonproductive status regulation.  C.f. 8 U.S.C. § 1184(n)(2)(C)(vii) with 20 C.F.R. §

17  655.731(c)(5)(i) (1997) (requiring employers to pay H-1B wages for employees in a nonproductive

18  status).  Congress was aware of DOL's inclusion of job contractors and staffing companies in the

19  definition of "employer."  The text of ACWIA shows Congress was also aware that staffing companies

20  were using H-1B visas. See 8 U.S.C. § 1182(n)(2)(E) and (F) (prohibiting an employer from "placing" an

21  H-1B employee with another employer who had recently laid off US workers); 8 U.S.C. § 1182(n)(2);

22  8 U.S.C. § 1182(n)(3)(A).

23    Congress unequivocally rejected INS's proposed requirement for nonspeculative work

24  assignments for the duration of the visa and adopted wholesale DOL's concept of allowing employees to

25  be placed on "nonproductive status" as long as they received their promised salary.  INS's proposed rule

26  requiring nonspeculative work assignments was seemingly abandoned, with no final rule or withdrawal

27  ever published in the Federal Register.

28    Undeterred, INS's successor agency, USCIS, sought new, extra-regulatory ways to eliminate IT

1   staffing companies from H1-B eligibility.  The Neufeld Memo, signed and published by USCIS on

2   January 8, 2010, applied new and onerous requirements to IT staffing companies and sought to eliminate

3   them from the program by excluding them from the definition of "United States employer."  Donald

4   Neufeld, USCIS., HQ 70/6.2.8 (AD 10-24), "Determining Employer-Employee Relationship for

5   Adjudication of H-1B Petitions, Including Third-Party Site Placements" (2010).  Whereas both DOL and

6   USCIS statutes and regulations plainly state the "employer" is the entity or person signing the LCA and

7   accepting legal liability for wages and working conditions, USCIS reinterpreted the plain language of its

8   own regulation, copied from DOL, defining a "United States employer."  It was no longer sufficient to

9   meet the regulation's disjunctive test of "hire, pay, fire, *or otherwise control*."  USCIS applied the

10  regulation in a manner that required IT staffing companies prove they had the power to hire, pay, fire,

11  *and* exclusively and completely control the employee.

12        USCIS then resurrected the rule prohibiting nonspeculative assignment that INS had seemingly

13  abandoned.  Despite Congress having already rejecting the agency's anti-staffing company policy,

14  USCIS went so far as to cite the notice of proposed rulemaking as binding authority, citing it as "to be

15  codified at 8 C.F.R. § 214.2(h)." PM-602-0159, Matter of S-Inc., Adopted Decision 2018-02 (AAO Mar.

16  23, 2018), available at https://www.uscis.gov/sites/default/files/document/memos/2018-3-23-PM-602-

17  0159-Matter-of-S-Inc-Adopted-Decision-Package.pdf, p 4, note 7 (accessed July 12, 2022).  The Trump

18  administration, through USCIS, published Policy Memo 602-0157 on February 18, 2018.  This new

19  Policy Memo created an enhanced itinerary requirement and required IT staffing companies to prove

20  guaranteed and nonspeculative work assignments for the entire duration of the requested H-1B validity

21  period.  PM-602-0157, "Contracts and Itineraries Requirements for H-1B Petitions Involving Third-Party

22  Worksites" available at https://www.uscis.gov/sites/default/files/document/memos/2018-02-22-PM-602-

23  0157-Contracts-and-Itineraries-Requirements-for-H-1B.pdf (accessed July 12, 2022).

24        In furtherance of its new requirement that IT staffing companies prove guaranteed, specific work

25  assignments, USCIS demanded copies of contracts with end clients, statements of work, and documents

26  showing the duration of a given project or contract.  PM-602-0157 at pp. 4-6.  These evidentiary

27  requirements were applied only to IT staffing companies, and not to other H-1B petitioners.  USCIS, in

28  its discretion, would deny or limit the approved H-1B validity period, resulting in "approvals" for IT

1    consulting companies ranging from a single day to six months.

2          Litigation ensued, with every court hearing the matter determined USCIS was in error by

3    enforcing its enhanced requirements for IT staffing companies.  ITServe Alliance, Inc. v. Cissna, 443

4    F.Supp.3d 14 (D.D.C. 2020); Serenity Info Tech, Inc. v. Cuccinelli, 461 F.Supp.3d 1271 (N.D. Ga.

5    2020); Stellar IT Sols., Inc. v. U.S. Cit. & Imm. Servs., Civil Action No. 18-2015 (RC), 2020 U.S. Dist.

6    LEXIS 10355 (D.D.C. June 12, 2020).  In ITServe Alliance v. Cissna, the plaintiffs were IT consultants

7    who placed IT employees with third party clients.  The district court found that the USCIS interpretation

8    of the H-1B regulations as requiring itineraries with jobsites for the entire visa period was invalid

9    because nothing in the H1B statute "requires specific and non-speculative qualifying day-to-day

10   assignments for the entire time requested in the petition. . . . What the law requires, and employers can

11   demonstrate, is the ***nature of the specialty occupation and the individual qualifications of foreign***

12   ***workers.***" ITServe, 443 F.Supp.3d at 39 (emphasis added).  The court also held the USCIS requirement

13   that an employer prove control of the H1B applicant's work by proving "the assignment of day-to-day

14   tasks" was not authorized by statute. Id. at 37.

15         As a result of ITServe and similar cases that followed, USCIS ceased enforcement of the itinerary

16   requirement and rescinded the Neufeld Memo and PM 602-0157.  PM-602-0114 "Rescission of Policy

17   Memoranda" (June 17, 2020) available at https://www.uscis.gov/sites/default/files/document/memos

18   /PM-602-0114_ITServeMemo.pdf (accessed July 12, 2022).  The current Policy Memo 602-0114, not

19   surprisingly, disavowed the detailed itinerary requirement.  Id. at 2.  Instead, the Policy Memo indicates

20   that an employer must only attest that it will employ the applicant in a specialty occupation, and "[i]f the

21   petitioner's attestations and supporting documentation meet this standard, then the officer should not

22   request additional evidence and should approve the petition, provided all other eligibility requirements

23   are met by a preponderance of the evidence." Id.  Again, the only reason USCIS previously demanded

24   "additional evidence" such as itineraries, was to establish the existence of guaranteed work assignments

25   for IT staffing companies, which the law did not allow USCIS to require.  Finally, USCIS conceded that

26   the statute allowed H-1B employers to place H-1B employees temporarily in a "nonproductive status"

27   which rendered unlawful the practice of shortening H-1B visas to coincide with evidence of work

28   assignments. Id. at 4.

### 4.  Anachronisms in the New Petition for H-1Bs: Form I-129

Even though USCIS's anti-staffing company policies have been rejected at every turn, the agency has had a difficult time letting go of its vestigial rules.  On May 31, 2022, USCIS published the most recent Form I-129 with instructions.  https://www.uscis.gov/sites/default/files/document/forms/i-129.pdf (accessed June 20, 2022).  At Part 5, Item 4, USCIS still asks if an itinerary has been included with the petition, even though an itinerary is not required, and USCIS is without statutory authority to enforce such a request.  Part 5, Item 5, likewise has not been updated and still asks if the employee will be placed at a client site even though the distinction between staffing companies and other employers has been rendered unlawful.

USCIS has also not updated the instructions to its form. https://www.uscis.gov/sites/default /files/document/forms/i-129instr.pdf (accessed July 12, 2022) at p. 3.  The agency still instructs employers that if an employee is likely to work in multiple locations, a complete itinerary with dates and locations must be included.  Not only does this instruction contradict its own and DOL's rules for employees working within a single MSA, but the instruction is also explicitly unlawful after multiple district court decisions and Policy Memo PM-602-0114, which implements the decision issued in ITServe.

## III.   LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may move to dismiss an indictment on the ground that the indictment "fail[s] to state an offense."  In considering a motion to dismiss an indictment, a court must accept the allegations in the indictment as true and "analyz[e] whether a cognizable offense has been charged." United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002).

The defendants here are charged with violating 18 USC § 1546(a).  The elements of a § 1546(a) are: (1) the defendant made a false statement in an immigration document; (2) the false statement was made knowingly; (3) *the statement was material to the Citizenship and Immigration Service's ("CIS") decision*; (4) the statement was made under oath or penalty of perjury; and (5) "the statement was made ... in an application required by ... [United States] immigration laws or regulations." See 18 U.S.C. § 1546(a); United States v. Chu, 5 F.3d 1244, 1247 (9th Cir. 1993); see also United States v. Wang, 944

F.3d 1081, 1087 (9th Cir. 2019)(citing Chu, 5 F.3d at 1247).

The definition of materiality in the immigration context has been the subject of extensive discussion in the Supreme Court and in the Ninth Circuit.  The Comment to the Ninth Circuit Jury Instructions regarding 18 USC § 1546 uses "the common law test for materiality in the false statement statutes."  Model Crim. Jury Instr. 9th Cir. 15.45 (2021), Comment.  The Comment cites United States v. Matsumaru, a Ninth Circuit visa fraud case which states, "A statement is material if it is capable of affecting or influencing a governmental decision. [Internal citations omitted]. United States v. Matsumaru, 244 F.3d 1092, 1101 (9th Cir. 2001).

The defense contends that the Supreme Court has recognized a higher standard of materiality in the immigration context, which requires the government to prove not only that a statement was false and capable of affecting a governmental decision, but also that the false statement tended to conceal a statutorily disqualifying fact. United States v. Alferahin, 433 F.3d 1148, 1155 (9th Cir. 2006). Qualification for the immigration benefit sought is a complete defense. Maslenjak v. United States, 137 S. Ct. 1918, 1930 (2017).

Even without the enhanced materiality standard, however, the alleged false statements alleged in the Indictment regarding specific job locations and assignments were not capable of affecting USCIS's decisions, as long as those decisions were made according to USCIS's statutory authority, and were not made on the basis of arbitrary, capricious, and withdrawn attempts to discriminate between consulting companies and other employers.

In Maslenjak v. United States, ––– U.S. –––, 137 S. Ct. 1918 (2017), the Supreme Court reversed a 6th Circuit decision, which held that the government need not prove materiality in a prosecution for a false statement to unlawfully procure naturalization under 18 USC § 1425.  United States v. Maslenjak, 821 F.3d 675, 682 (6th Cir. 2016).  Maslenjak expanded the materiality inquiry set forth in Kungys v. United States, 485 U.S. 759 (1988), and held the government must show a "means-end connection" or "causal influence" between a defendant's false statement made under oath and an immigration benefit. 137 S.Ct. at 1923, 1925-27.  Maslenjak requires more than just a knowing misrepresentation. Id. at 1922-24.  The Supreme Court held that the alleged lies must be "material" - that the defendant lied about facts that "would have mattered to an immigration official." Id. at 1923.  The

Supreme Court described the materiality inquiry as an objective test that focuses on whether "**knowledge of the real facts would have affected a reasonable government official *properly applying* [immigration] law**." Id. (emphasis added).  Finally, causation is required - the illegal act, lying, must have "played some role in [the] acquisition of [the immigration benefit]," which in Maslenjak was United States citizenship. Id. at 1923.

This case is like Forbes v. INS, 48 F.3d 439 (9th Cir. 1995), in which the Ninth Circuit held that Forbes' failure to disclose his prior arrest on his visa application was not material because the charges were eventually dropped and would not have impacted the visa determination.  The Court initially found that "disclosure of the arrest would predictably have revealed the charges pending against Dr. Forbes, which were relevant to his qualifications," and therefore had a natural tendency to influence the decision of the INS.  48 F.3d at 442-43.  However, the Court held the false statement regarding the arrest was not material because the charges were ultimately dropped, and the government failed to prove that "that a statutory disqualifying fact actually existed." Id. at 443.

In Hussein v. Barrett, No. 11-cv-05317-JST, 2017 U.S. Dist. LEXIS 44790, at *15-18 (N.D. Cal. Mar. 27, 2017), the government argued that Hussein committed perjury under federal law when he falsely stated in his 2005 naturalization application that he had been living with his United States citizen spouse for the three years prior to his application.  At trial, Hussein's testimony revealed that the statement in the application was knowingly false.  Hussein argued that the false statement was not material to his naturalization application because he would have qualified for naturalization on a ground independent of his marriage to and cohabitation - namely, his own legal permanent residence in the United States for the preceding five-year period.  The district court held that Hussein's false statement about cohabiting with his spouse was not material to his naturalization application, and therefore not perjurious because he was eligible for citizenship regardless of whether he was married to or cohabiting with his spouse.

Here, the government has not and cannot allege facts that would make the visa beneficiaries ineligible for H-1B visas.

On this motion to dismiss, this Court must evaluate whether, when "*properly applying*" **valid** immigration requirements, the government has pleaded sufficient facts to show the alleged false

1   statements would have been material to a CIS decision.  This the government has **not** done and cannot

2   do, because the requirements to provide specific project site locations for the entire time period of the H-

3   1B visa and to provide day-to-day work assignment information were based on withdrawn policy

4   memoranda, which were found to be arbitrary and capricious in ItServe and have been rescinded.  Policy

5   Memo 602-0114 states clearly: "The officer may not apply the prior rescinded guidance." PM-602-0114

6   at p. 2.

7        For purposes of this motion, the defense accepts the Indictment's factual allegations as true and

8   argues that those facts, as a matter of law, cannot support the materiality element.  A motion to dismiss

9   an indictment can be determined before trial "if it involves questions of law rather than fact." United

10  States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir.), cert. denied, 478 U.S. 1007 (1986).

11  **IV.   ARGUMENT**

12       Accepting as true the allegations in the Indictment, the government has failed to state an offense.

13  On the facts alleged, there was no *material* misrepresentation to immigration officials because the alleged

14  false statements were not "capable of affecting or influencing a governmental decision" as a matter of

15  law.  United States v. Matsumaru, 244 F.3d 1092, 1101 (9th Cir. 2001).  The alleged false statements - all

16  regarding the jobsite location and the assignment on which an applicant would work - are not relevant to

17  USCIS's inquiry, which is limited by policy and statute to a determination of whether an applicant will

18  work in a "specialty occupation." 8 U.S.C. § 1184(i).  Those alleged false statements were in response to

19  questions seeking to enforce rescinded policy memoranda and Policy Memo 602-0114 states clearly:

20  "The officer may not apply the prior rescinded guidance." PM-602-0114 at 2.

21       In Matsumaru, the Ninth Circuit found there was sufficient evidence of materiality where there

22  was evidence that an applicant for a treaty investor visa was not actually a qualified treaty investor.

23  Matsumaru, 244 F.3d at 1101.  The court held that the visa applicant was not actually a treaty investor

24  because he had "ceded all managerial control" of his investment company and therefore "was not

25  developing and directing his enterprise as required under the treaty investor statute and regulations." Id.

26  at 1104 (citing 8 U.S.C. § 1101(a)(15)(E)(ii); 22 C.F.R. § 41.51(p); 9 F.A.M. § 41.51 N.11.1).  The court

27  found sufficient evidence of materiality because an INS officer testified the misstatements would have

28  led her to question the application because in reality, "it doesn't appear that [the applicant] is directing

1   and developing any investment." Id. at 1102.

2          Thus, in Matsumaru, the misstatements were material because they were relevant to the very

3   inquiry that INS was statutorily responsible for making: whether the applicant was in fact a qualified

4   treaty investor.  Here, by contrast, the government has alleged that the defendants made misstatements

5   regarding the location and assignments on which PVIPs employees would work, misstatements which

6   had no bearing on the limited inquiry USCIS is statutorily authorized to make.  As discussed above, in

7   the context of an H-1B application, USCIS is tasked only with determining whether the occupation

8   qualifies as a "specialty occupation," which the beneficiary is qualified to perform.  Beneficiaries are not

9   bound to a specific assignment. 8 U.S.C. § 1184(i).  Although USCIS has long attempted to deny visas to

10  staffing companies based on its perception of who is a legitimate "employer," federal courts have ruled

11  USCIS has no statutory authority to make a determination about the employer/employee relationship, and

12  USCIS's own policy confirms that its officers may no longer consider things like where an applicant will

13  physically work. ITServe, supra 443 F.Supp.3d 14; Serenity Info Tech, supra, 461 F.Supp.3d 1271;

14  Stellar IT Sols., supra, 2020 U.S. Dist. LEXIS 10355; PM-602-0114 "Rescission of Policy Memoranda,"

15  supra, (issued by USCIS in response to the ITServe decision).  Had the government alleged the

16  defendants provided false statements or documents relevant to whether H-1B applicants would be

17  employed in "specialty occupations" - such as by providing false resumes, or falsely listing a person's

18  skill set or education, or representing that they would work in software development when they would in

19  fact work as unskilled laborers - then the government theoretically could have alleged a material

20  misrepresentation akin to those in Matsumaru.  But here, the government has only alleged that the

21  defendants made misrepresentations about the physical location and assignments for PerfectVIPs'

22  employees, misrepresentations that, even if proven true, could not possibly "affect[] or influenc[e] a

23  governmental decision" regarding whether the beneficiary was qualified to perform a specialty

24  occupation.  See Matsumaru, supra, 244 F.3d at 1101.

25         18 USC § 1546(a) requires, among other elements, that the statement was material to the USCIS

26  decision; and that "the statement was made ... in an application required by ... [United States]

27  immigration laws or regulations." See 18 U.S.C. § 1546(a) (emphasis added); United States v. Chu,

28  supra, 5 F.3d at 1247; see also Wang, supra, 944 F.3d at 1087 (citing Chu, 5 F.3d at 1247).  As we have

discussed above, the immigration laws and regulations do not require the level of granular detail requested by Form I-129, which was based on the prior rescinded guidance of the Neufeld Memo and PM-602-0157. The current Policy Memo clearly states: "The officer may not apply the prior rescinded guidance." PM-602-0114 at 2.

When USCIS gives a clear direction to its adjudicators that the granular location information may not be applied when making the visa decision, that information simply cannot be material.

Moreover, when signing an LCA, an employer agrees to participate in a complaint-driven, post-approval enforcement process because H-1B petitions are supposed to be granted through an attestation process. See 20 C.F.R. § 655.731 through 655.735 and corresponding subparagraphs (A) though (D) of 8 U.S.C. § 1182(n)(1)).  USCIS's own Policy Memo unambiguously directs its adjudication officers[1] that "If the petitioner's attestations and supporting documentation meet this standard, then the officer should not request additional evidence and should approve the petition."  PM-602-0114 at 2.

Unlike the anti-immigration policies of USCIS, Congress and the DOL recognized that the H-1B visa is temporary and that lengthy preapproval inquiries would consume precious worker time. Interim Final Rule, 56 Fed. Reg. 54720, 54721 (October 27, 1991) ("The Department believes that Congress ... intended to provide greater protection than under prior law for U.S. and foreign workers without interfering with an employer's ability to obtain the H-1B workers it needs on a timely basis. Accordingly, the Department is providing that a labor condition application be accepted if it is complete, ... thereby minimizing the time it takes to obtain approval of H-1B workers.").  As a result, and directly in accord with the 1990 Immigration and Naturalization Act, DOL's regulations enforce the terms of LCA's (wages, working conditions, etc.) in a *post-facto*, complaint-driven system, rather than by prior examination.  See 8 U.S.C. § 1182(n)(2)(A) (requiring DOL to "establish a process for the receipt, investigation and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application ... or a petitioner's misrepresentation of material facts in such an application" filed by

---

[1] An adjudicator reviews immigration benefit requests to determine jurisdiction, presence of required supporting documentation, existence of related files, and eligibility.  See USCIS Policy Manual, Vol. 1, Part E, Chapter 1 available at https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-1 (last accessed May 20, 2022).  In other words, an adjudicator "ma[kes] decisions on petitions and applications for aliens seeking benefits into the United States." United States v. Matsumaru, 244 F.3d 1092, 1101 (9th Cir. 2001).

1    any aggrieved person or bargaining representative within 12 months of the failure or misrepresentation).

2    The DOL enforcement process was adopted in elaborate detail by Congress and placed in the statute. See

3    8 U.S.C. § 1182(n)(2)(C); 20 C.F.R. § 655.800.  That process anticipates an enforcement process with

4    administrative penalties after a visa has been granted. Id.

5          Because USCIS exceeded its authority in requesting the location and specific assignment

6    information, and USCIS is not allowed to use that information in the initial visa determination, location

7    and specific assignment information cannot be material.

8          The Ninth Circuit has not yet opined on ITServe and the new policy guidance by USCIS

9    regarding whether a false statement could be material if given in response to questions that USCIS is not

10   entitled to ask or rely upon.  We anticipate, however, that the government may attempt to rely on an

11   unpublished Fourth Circuit case, United States v. Narang, No. 19-4850, 2021 U.S. App. LEXIS 23566,

12   2021 WL 3484683 (4th Cir. Aug. 9, 2021), recently followed by Judge Corley in United States v.

13   Guntipally, No. 16-CR-00189-JSC-1, 2022 U.S. Dist. LEXIS 92261, 2022 WL 2183285 (N.D. Cal. May

14   23, 2022), to argue that the answers on the Petitions and RFEs relating the beneficiaries' itineraries and

15   non-speculative work were material.

16         Neither Narang nor Guntipally are on point because the underlying cases were litigated prior to

17   the decision in ITServe and USCIS's recission of the Neufeld Memo and PM-602-0114 in response to

18   ITServe.  Moreover, the primary issues in both cases were not the materiality of the alleged false

19   statements.  In Narang, the primary issue was whether there was jurisdiction over the case against Narang

20   "both because the immigration laws did not prohibit EcomNets's third-party staffing model and because

21   those same laws were too uncertain to make her conduct a crime against the United States." Narang,

22   2021 U.S.App. LEXIS 23566, at *11.  In Guntipally, the issue was whether her counsel was ineffective.

23   Guntipally, 2022 U.S. Dist. LEXIS 92261, at *5.

24         The Court in Narang, however, also discussed whether there was sufficient evidence to sustain

25   the conspiracy and substantive count convictions, and found Narang's false statements were material

26   because there was no dispute that a Form I-129 petition is required to obtain an H-1B visa and there was

27   "USCIS adjudicator testimony that these statements would be considered material when considering

28   whether to accept an H-1B petition, *particularly for staffing companies, which the agency more carefully*

*scrutinizes*." Narang, 2021 U.S. App. LEXIS 23566 *22, 24 (emphasis added).  Because there is no legal basis for more carefully scrutinizing applications from staffing companies, there can be no longer be such testimony regarding the materiality of the alleged false statements for the formerly and illegally more carefully-scrutinized staffing companies.  Accordingly, Narang, is no longer good law, and has been superseded by statute.

In Guntipally's case, she specifically admitted submitting "more than 100 phony H-1B visa applications" to the federal government containing "false representations and material omissions;" Guntipally, supra, 2022 U.S. Dist. LEXIS 92261, at *2; and that those "petitions and other supporting documents . . . contained false representations and material omissions about the nature and existence of purported end-client companies and the nature, existence, and scope of H-1B positions," including listing end-client companies that "either did not exist or never received the proposed H-1B workers;" and that she "knew the false statements contained in [the] petition [for foreign worker P.M.] were material to the activities and decisions of the [government] in considering and evaluating beneficiary P.M. for an H-1B visa." Id. at *6-7.

Guntipally's admission that she submitted more than 100 phony H-1B applications containing materially false statements is very different than the situation here where the only alleged false statements relate to information supplied to comply with rescinded policy memoranda that district courts have held contained extralegal requirements unsupported by statute. ITServe, supra 443 F.Supp.3d 14; Serenity Info Tech, supra, 461 F.Supp.3d 1271; Stellar IT Sols., supra, 2020 U.S. Dist. LEXIS 10355. Policy Memo 602-0114 states that the information the government relies upon in the Indictment may ***not*** be used by USCIS. PM-602-0114, supra, at 1. ("USCIS officers should not apply the above-listed memoranda to any pending or new requests for H-1B classification.)  Judge Corley's Guntipally opinion did not consider the rescission of the Neufeld Memo and the new USCIS policy guidance limiting the inquiry of USCIS, nor did the opinion provide any reasoning why the statements regarding end-clients were material, but it instead simply states that, "applicants such as Ms. Guntipally are required to be truthful in the H-1B applications themselves."  Id.  By that reasoning, any statement on the I-129 would be material, and as we discussed above, only statements required by law can be a basis for liability under § 1546.

1    In short, this prosecution is an attempt to make and end-run around both the courts' and

2 Congress's rejection of USCIS's anti-staffing company policies.  Throughout the history of the H-1B

3 program, DOL, the lead agency in H-1B enforcement, has consistently rejected anti-staffing company

4 policies.  Congress and the courts have agreed with DOL and rejected USCIS's unlawful attempts to

5 exclude these businesses from the H-1B program.  Having failed to exclude staffing companies from the

6 H-1B program via agency guidance, USCIS now seeks to enforce its unlawful policies through a criminal

7 prosecution, based on answers to questions USCIS had no right or reason to ask.  USCIS's efforts to

8 create hurdles that have no basis in law or regulation must be rejected.

9 **V.    CONCLUSION**

10    For the reasons discussed above, we respectfully request this Court to dismiss the Indictment.

11

12 Dated: July 25, 2022                              Respectfully submitted,

13                                                  _____/s/_____

14                                                  Christopher J. Cannon
                                                    Matthew A. Laws
15                                                  Attorneys for NAMRATA PATNAIK

16

17

18

19

20

21

22

23

24

25

26

27

28